## Hughes *versus* Oaks and Linn.

1. Mellen, assuming to act as agent of the secretary of the treasury under the Acts of Congress of July 13th 1861, and May 2d 1862, relating to intercourse with states in insurrection, extended the prohibitory line of intercourse, and his act was approved by the secretary. *Held*, that his act had the authority of the government and was admissible in evidence.

2. Mellen informed a collector of customs of the extension of the line and instructed him to guard transportation over it: these instructions were approved by the secretary. The collector could appoint an agent to carry out these instructions, and the agent was competent to prove his appointment and authority.

3. The government in enforcing its military power might have totally prohibited commerce and transportation over lines of dangerous proximity to the rebel forces.

4. Laws enacted to quell the rebellion are entitled to a liberal interpretation to accomplish their purpose.

5. By the Acts of Congress of 1861 and 1862, a sound discretion was vested in the secretary of the treasury to make rules in relation to intercourse with insurrectionary states, &c., which is of a governmental character and is not liable to revision or reversal.

6. The Acts of July 1861 and May 1862, and the regulations under them construed.

7. The defendants transported goods for the plaintiff, but refused to deliver them to him to be carried within the prohibited line as authorized by the secretary of the treasury, unless plaintiff would obtain a permit, take the oath of allegiance and pay the freight, which he did not do; the goods were afterwards seized by the rebels. *Held*, that the defendants were not liable.

8. The court instructed the jury " that it was the plaintiff's duty when the freight was demanded to offer to pay it, and if the defendants did not specify the amount, they would not be justified in refusing to deliver the goods." *Held*, not to be error.

9. The defendants had no lien on goods then in their warehouse for prior freight.

May 13th 1868.   Before Thompson, C. J., Strong, Read, Agnew and Sharswood, JJ.

Error to the Court of Common Pleas of *Franklin county :* Of May Term 1868, No. 82.

This was an action on the case, brought June 24th 1864, by Holker Hughes against David Oaks and Samuel M. Linn, trading as Oaks & Linn.

The declaration contained two counts for not delivering to the plaintiff his goods, which the defendants had received for him; one count charging them as common carriers, and the other as warehousemen; the plea was " not guilty."

The plaintiff was an iron master, operating a furnace, forge and rolling-mill in Franklin county, and the defendants were forwarding and commission merchants in Chambersburg. They received goods for the plaintiff in Philadelphia about June 1863, and carried them to Chambersburg. They were sent for by the plaintiff, but the defendants required that the plaintiff should obtain a per-

[Hughes v. Oaks.]

mit from the collector of customs at Philadelphia, take the oath of allegiance, and also pay the charges for carriage, before they would deliver them. This was not done, and shortly afterwards the rebels under one Jenkins entered Chambersburg and carried the goods away.

On the trial, before King, P. J., the plaintiff gave evidence of the delivery of the goods to the defendants, of demand by his teamsters by his order for the goods; that defendants declined to deliver the goods until Mr. Hughes would get a permit, take the oath of allegiance, and pay "freight that was back." The plaintiff here rested.

The defendants then offered certified copies of the following papers, viz. :—

"Regulations concerning internal and coastwise intercourse," dated August 28th 1862; the regulations issued by the secretary of the treasury, approved by the President, under the Act of Congress of July 13th 1861; two letters from William P. Mellen, special agent regularly appointed with the approval of the secretary of the treasury. They also offered to prove that Amos Shauntz was appointed agent by William B. Thomas, collector at Philadelphia, and instructed to give notice to all forwarding and commission merchants in Adams and Franklin counties north of the parallel of Gettysburg, not to send goods south of that parallel, until the consignors should comply with the regulations mentioned in the first offer; that Shauntz gave the defendants the notice, and forbade the removal of the plaintiff's goods until he should comply with the regulations. Both offers were objected to by the plaintiff, admitted by the court, and several bills of exceptions sealed.

The Act of Congress of July 13th 1861, § 5, enacts that when the President, under the Act of February 28th 1795, shall call forth the militia to suppress insurrection, &c., and the insurgents do not disperse, the President may by proclamation declare that the inhabitants of a state, &c., where the insurrection exists are in a state of insurrection, and thereupon all commercial intercourse with the rest of the United States shall cease and be unlawful, and all goods, &c., coming from the insurgent section into other parts of the United States, together with the vessel or vehicle conveying them, shall be forfeited, with a proviso that the President may license commercial intercourse with the place where insurrection exists, and such intercourse shall be conducted only in pursuance of regulations prescribed by the secretary of the treasury. The 3d section of the Act of May 20th 1862, empowered the secretary of the treasury to prohibit the transportation on any railroad, &c., of any goods, &c., where there shall be satisfactory reason to believe that such goods, &c., whatever may be their ostensible destination, are intended for any place in pos-

9 P. F. Smith—3

[Hughes *v.* Oaks.]

session of the insurgents, or that there is imminent danger that they will fall into their possession or under their control; also to require reasonable security that such goods, &c., shall not be transported to any place under insurrectionary control, and shall not in any way be used to give aid and comfort to the insurgents; and to establish such regulations as may be necessary to carry the purposes of the act into effect, &c.

On the 28th of August the secretary of the treasury prescribed certain regulations to carry out the purposes of the act: 1. No goods, &c., whatever might be their ostensible destination, should be transported to any place under the control of the insurgents, nor to any place on the north side of the Potomac and south of the Washington and Annapolis Railroad, &c., without a permit of a duly authorized officer of the treasury department, " and the special agents of this department may temporarily extend these restrictions to such other places in their respective districts, and make such local rules to be observed therein as may from time to time become necessary, promptly reporting their action to the secretary of the treasury for his sanction or disapproval."

4. Applications for permits are to state the character and nature of the merchandise, the consignee and destination, the route, and the number, description and marks of the packages.

5. The applicant is to present the original invoices with an affidavit of their correctness, that the goods shall not be disposed of in violation of the terms of the permit, nor so " as in any way to give aid, comfort, information or encouragement to persons in insurrection against the United States. And furthermore, that the applicant is loyal to the government of the United States, and will in all things so deport himself."

The letters from Mellen were dated November 3d 1862, one to W. B. Thomas, collector at Philadelphia, the other to Mr. Chase, secretary of the treasury.

By the first, Mr. Thomas is instructed, that restrictions on internal commerce under the regulations of August 28th 1862, were extended so as to embrace all counties in Maryland on the north side of the Potomac, &c., and all that portion of the counties of Adams and Franklin, in Pennsylvania, south of the parallel of Gettysburg. The second is to the secretary of the treasury, in which Mellen reports the condition of affairs on the line of the Baltimore and Ohio Railroad to Harper's Ferry, and on the line of the Philadelphia, Wilmington and Baltimore Railroad, and concludes :—

" In view of the condition of things along the Potomac west of Baltimore, and upon consultation with Messrs. Hoffman, Thomas and others, I have extended the restrictions under your regulations of August 28th 1862, 'so as to embrace all the counties in Maryland, on the north side of the Potomac, bordering thereon,

[Hughes v. Oaks.]

and all that portion of the counties of Adams and Franklin, in Pennsylvania, south of the parallel of Gettysburg,' and have so advised the collectors at Baltimore and Philadelphia in duplicate letters, of which the enclosed is a copy.   In all of which I hope for your sanction and approval."

The secretary of the treasury replied to Mellen under date of November 5th 1862, acknowledging the receipt of Mellen's letter of the 3d, and approving his " action in the premises."

Shauntz testified: He was appointed by the collector at Philadelphia to aid the revenue, and under his orders witness established a line on the parallel of Gettysburg.   Mt. Alto, a furnace of plaintiff, is south of the line.   He directed the warehousemen at Chambersburg to allow no goods to pass over that line without a permit; he gave notice to the defendants not to allow goods to go to Mt. Alto.

A marauding party of rebels under Jenkins took some of the goods on the 15th of June, after the plaintiff's teamsters had asked for them.   There was evidence that the charges for freight on the goods then in the house were demanded of them, and that there was a running account kept with the plaintiff for freight, and that the freight was charged against him as the manifests were received; the wagoners did not ask what was the amount due for freight, but said that they would tell the plaintiff.

The plaintiff in rebuttal gave other evidence as to the demand for the freight, and also that Mt.. Alto Furnace is north of the parallel of Gettysburg, and that the remainder of the works of the plaintiff are south.   He also gave evidence that the goods in question were for his own use and that of his hands at his iron works.

Amongst others, the plaintiff submitted the following points :—

2. The regulations of the secretary of the treasury, and the acts of the agents under them " were unauthorized by law, unconstitutional and void, and not a defence for the refusal to deliver the goods."

4. The Acts of Congress and the official instructions under them, did not make it necessary that the plaintiff should obtain a permit from the collector at Philadelphia, and take the oath of allegiance, to obtain the goods which were intended for his own use.

5. If the defendants had no right to demand a permit and oath of allegiance, the plaintiff must recover, although they demanded payment of the freight, and the payment was not tendered and paid before the demand of the packages.

7. If the defendants intended to rely upon their lien on the goods for the freight, it was their duty to inform the plaintiff of the precise amount due, and to demand that amount and no more, and having failed to do so, they cannot defeat plaintiff's recovery because of non-payment of the freight.

[Hughes *v.* Oaks.]

8. If the jury believe, that the defendants had a running account for freights, against the plaintiff, and had never before exacted the payment of the freight from plaintiff, before delivery of his goods, the plaintiff had a right to rely on this course of dealing between the defendants and himself, and he was not in default in not tendering the freight on these goods, before demanding them, unless he was informed that the goods would not be delivered without payment of freight.

9. The evidence showing that the goods were in separate parcels, and the freight thereon only from $5 to $6, the defendants had no right to retain all the goods until the freight was paid.

Judge King, after referring to the facts, charged :—

" In regard to the payment of the freight and charges due on the goods demanded, we say to you that, if the freight and charges were demanded, and the plaintiff or his agents neglected or refused to pay them, the defendants would be justified in refusing to deliver them until such freight and charges were paid, unless there was some contract or agreement between the parties which would amount to a waiver of the defendants' right to demand the payment. The fact that the defendants kept an account against the plaintiff for freight on goods, theretofore carried for plaintiff, is some evidence of an understanding between the parties, that goods were to be delivered and the freight charged ; yet if you believe there was a demand for the freight of the goods in question, it was the duty of the plaintiff or his agents to comply with such demand.

" The important question, however, arising in this cause, is the defence based upon the regulations of the secretary of the treasury ; but it is one that involves the proper construction of the Act of Congress and a minute inquiry into the power and authority of that officer, and which we are inclined to refer to the Supreme Court. * * *

" We hold that the Acts of Congress fully warranted the regulations adopted, and that the act of the special agent approved by the secretary of the treasury, was in strict conformity with law.

" We then say to you, that, if you find that the goods, which defendants refused to deliver to the plaintiff's teamsters, were intended for that portion of Mt. Alto Iron Works, lying south of the parallel of Gettysburg, the line established by the special agent, being the forge and rolling-mill which seem to have been conducted in the name of Holker Hughes & Company, the defendants were warranted in refusing to deliver them to the plaintiff. But if you believe that they were intended for Mt. Alto Furnace, which is north of the line referred to, and that no demand was made for freight and charges due upon these goods, the defendants are responsible to the plaintiff for so much of the goods as were in their warehouse at the time they were demanded

by the teamsters; and in this aspect of the case, it will be your duty to ascertain what goods were in the warehouse, when demanded and refused, and their value.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"In order that you may the better understand and apply this evidence, we state again the questions of fact you are called upon to settle and determine.

"First. What goods were in the warehouse at the time they were demanded by the plaintiff or his agents, and what is the value of them?

"Second. Was there a demand for the payment of the freight and charges, and was that demand confined to the freight and charges due on the particular goods demanded? In connection with this question of fact we say that defendants had no right to detain for previous freight.

"Third. Were the goods demanded intended to be taken to a region south of the Gettysburg parallel?

"In what we have already said we have given full answers to the prayers for instruction submitted by the counsel for the defendants; and it only remains to notice the points of the plaintiff.

"We affirm the 1st point. We refuse to affirm the 2d.

"In reply to the 3d, we instruct you that if you are satisfied from the evidence that the goods in question were not intended to be taken to the forge and rolling-mill of the plaintiff south of the parallel of Gettysburg, but were to be used at the furnace which is north of that line, the position assumed here is correct, and we affirm it.

"We cannot assent to the proposition contained in the 4th and 5th points as broadly as they are therein set forth.

"In answer to the 6th and 7th points, we instruct you that it was the duty of the plaintiff, when the freight was demanded, to offer to pay the freight, and then if the defendants did not specify the amount claimed to enable the plaintiff to pay the same, they would not be justified in refusing to deliver the goods. And we further say that the defendants had no lien on the goods then in the warehouse for prior bills of freight.

"The fact assumed in the 8th point would not excuse the plaintiff from paying or offering to pay the freight demanded, if the demand was confined to the freight and charges due on the particular goods then in the warehouse. The defendants were not bound to trust the plaintiff in the future because they had done so in the past. We cannot affirm this point as stated by the counsel.

"We have answered the 9th point in the general charge."

The verdict was for the defendants.

The plaintiff took a writ of error.

The 1st and 8th specifications of error were the admission of the evidence stated in the bills of exception. The 2d to 7th were the answers to his points.

*J. McD. Sharpe*, for plaintiff in error, cited the Acts of Congress referred to above; 12 Stat. at Large 257, 404; 2 Brightly's U. S. Dig. 193, 194, pl. 15–23, and July 2d 1864, § 4; 13 Stat. at Large 374; 2 Brightly's U. S. Dig. 195, pl. 27; Dwarris on Stat. 693, 756. As to lien for freight: Steinman *v.* Wilkins, 7 W. & S. 466; Fuller *v.* Bradley, 1 Casey 120.

There was no paper-book furnished to the reporter by the defendants in error.

The opinion of the court was delivered, May 20th 1868, by

Agnew, J.—All the objections raised by the assignments of error may be reduced to two principal questions. The minor points as to the authority of William P. Mellen, agent of the treasury department of the United States, and Amos Shauntz, agent for the collector of Philadelphia, are easily disposed of. To the primâ facie evidence of authority, derived from their *de facto* character in their relations to the public, is to be added express recognition by the government. In his letter of November 3d 1862 to Mr. Chase, secretary of the treasury, William P. Mellen informed Mr. Chase that in view of the condition of things along the Potomac west of Baltimore, and upon consultation with Messrs. Hoffman, Thomas and others (Thomas then being the collector of Philadelphia), he had extended the restrictions under his (Mr. Chase's) regulations of August 28th 1862, "so as to embrace all the counties in Maryland on the north side of the Potomac bordering thereon, and all that portion of the counties of Adams and Franklin in Pennsylvania south of the parallel of Gettysburg;" and had so advised the collectors at Baltimore and Philadelphia in duplicate letters, of which the enclosed (he says) is a copy. This action of Mellen was approved by the secretary of the treasury on the 5th of November 1862. After this date there can be no question that the act of Mellen being ratified had the sanction and authority of the government. The letter addressed by Mellen to William B. Thomas, Esq., collector of Philadelphia, dated November 3d 1862, was thus approved by Mr. Chase, and in it Thomas was informed of the extension of the regulations, and that all transportation must be subject to permits under the same regulations as if made to places in Maryland south of the Washington and Annapolis Railroad; and he was directed that shipments should be very carefully guarded, and restricted in quantities to the supply of the neighborhood to which they are sent for the necessary and immediate use thereof.

[Hughes v. Oaks.]

These duties, extending over a wide district of country, could not be performed by Thomas the collector personally, and therefore rendered the appointments of agents to superintend the transportation of goods in the direction of the forbidden territories an essential duty and necessity.   No commission was necessary to invest Shauntz with authority, and therefore he was clearly competent to prove the appointment and authority derived from Mr. Thomas.   We are now brought to consider the principal question in the cause, to wit, the authority of the secretary of the treasury to establish the regulations and restrictions of the 28th of August 1862, and to extend them to what has been termed loyal territory in the counties of Adams and Franklin, south of the parallel of Gettysburg.

By various Acts of Congress, under the provisions of the Constitution to suppress insurrection and cause the laws of the United States to be executed, the President of the United States has been invested with ample powers to suppress unlawful insurrections, and, as commander in chief of the forces, to carry on military operations to subdue those in rebellion to the authority of the government.   Undoubtedly one of the chief means of reducing an enemy is the restriction of his supplies, and for this purpose a blockade of the southern ports was proclaimed and affirmed by the highest judicial authority.   But the almost boundless extent of the lines drawn between the insurgent and loyal states required as much vigilance upon the land as upon the sea to prevent the furnishing of these supplies from the latter to the former, while the varying fortunes of war made the line itself movable in its location and uncertain in its duration.   The never to be forgotten retreat of the Federal armies from the peninsula of Virginia, after the unsuccessful battles before Richmond in the summer of 1862, followed by the defeat of our forces before Washington in the second battle of Bull Run, forced this shifting line up into Maryland, and was followed by incursions into Pennsylvania, and into these very counties of Adams and Franklin, ending in the great battle of Antietam on the 17th of September 1862.   It was on the 28th of August 1862, during this season of gloom, the regulations of the treasury department were framed and published to prevent supplies from passing over to the enemy, and it was on the 5th of November the secretary extended these regulations by his approval to the territory in Adams and Franklin county, south of the parallel of Gettysburg, which, according to the proof, would be a line at about eight miles distance north of the state boundary.   The continuation of the state of affairs which rendered these regulations of the treasury department necessary to prevent illicit intercourse with the rebels, by restrictions upon all goods sent for transportation southward, in the direction of the rebel lines, is clearly shown in the very facts of

this case. The goods, the loss of which was the cause of this controversy, were forwarded in the month of June 1863 to Chambersburg in different parcels, and from the 1st to the 14th day of that month. On the 15th of the month they fell into the hands of a marauding party of the rebels, under General Jenkins, and were carried off, and it will be remembered that this was followed immediately by the march of General Lee into Pennsylvania, resulting in the battles at Gettysburg on the 1st, 2d, 3d and 4th of July 1863. It is very clear, therefore, that the condition of affairs then existing amply justified the regulations of the treasury department, making restrictions upon the transportation of all merchandise south of the parallel of Gettysburg.

These regulations provided that no goods, wares or merchandise, whatever may be the ostensible destination thereof, shall be transported to any place then under the control of insurgents; nor to any place on the north side of the Potomac and south of the Washington and Annapolis Railroad, &c. The special agents of the department were authorized to extend these restrictions to such places in their districts, and make such local rules to be observed therein, as might from time to time become necessary, promptly reporting their action to the secretary of the treasury for his sanction or disapproval. All applications for permits to transport or trade under these regulations were required to state the character and value of the merchandise to be transported, their consignee and destination, the route of transportation, and the number and description of the packages, with their marks. The applicant was required to present also the original invoices, and to make and file his affidavit of the correctness of the matter stated, that the packages contained nothing except as stated in the invoices, and that the goods should not by his permission, authority or connivance be disposed of or transported so as in any way to give aid, comfort, information or encouragement to persons in insurrection against the United States. In addition, he was required to swear that he was loyal to the government, and would in all things so deport himself. Now, clearly there was nothing in all these provisions either unreasonable or unsuited to the then state of affairs on the southern boundary of Pennsylvania. The state of affairs showing the propriety, indeed, the necessity of extending the regulations in question to the southern parts of Adams and Franklin counties, has not been referred to because it was necessary to justify the exercise of the power, but because the arguments so strongly questioned its application to the territory of a loyal state. It was indeed in the power of the government in the enforcement of its military authority, totally to prohibit commerce and transportation over lines of dangerous proximity to the rebel forces. The simple question left for inquiry is, whether the Acts of Congress cited are sufficient in

their terms to authorize these regulations on part of the secretary of the treasury. Of this there can be no doubt. It must be remarked *in limine* that such laws, enacted to save the very life of the nation while engaged in efforts to quell a stupendous rebellion against its power and authority, are entitled to a liberal interpretation to accomplish their purpose.

The 5th section of the Act of Congress, approved July 13th 1861, confers full authority upon the President, after he shall have called out the militia to suppress combinations against the laws of the United States, and to cause the laws to be duly executed, and the insurgents have failed to disperse within the time directed by the President, &c., to declare, by proclamation, that the inhabitants of such state (to wit, one in insurrection), or any section or part thereof are in insurrection, and thereupon all commercial intercourse, by and between the same and the citizens thereof and the citizens of the rest of the United States shall cease and be unlawful, so long as such condition of hostility shall continue. The act then provides for licensing commercial intercourse in the discretion of the President, to be conducted and carried on only in pursuance of rules and regulations prescribed by the secretary of the treasury; investing the secretary with power to appoint such officers as may be necessary to carry into effect such licenses, rules and regulations. This act being confined to states and parts of states in insurrection, the authority of the secretary was extended by the 3d section of the Act of 20th May 1862, which provided " that the secretary of the treasury be and he is hereby further empowered to *prohibit and prevent the transportation,* in any vessel, or upon any railroad, turnpike or other road or means of transportation within the *United States,* of any goods, wares or merchandise, of whatever character, and whatever may be the *ostensible destination* of the same, in all cases where there shall be satisfactory reasons to believe that such goods, wares or merchandise are intended for any place in the possession or under the control of insurgents against the United States, or *that there is imminent danger that such goods, wares or merchandise will fall into the possession or under the control of such insurgents,* and he is further authorized in all cases when he shall deem it expedient so to do, to require *reasonable security* to be given, that goods, wares or merchandise shall *not be transported to any place* under insurrectionary control, and shall not be used in any way to give aid or comfort to such insurgents," &c. He is also authorized to establish all necessary *general* or *special* regulations to carry the purposes of the act into effect. Under both acts there is a forfeiture declared of all goods, &c., attempted to be transported in violation of the law. It is clear under the Act of 1862 that the authority of the secretary of the treasury is extended to all places in the United States, and therefore out-

side of the insurrectionary states, and within loyal territory, and to all goods, whatever may be their ostensible destination, where he has satisfactory reasons to believe that there is imminent danger that such goods will fall into the possession or under the control of the insurgents, or may be used in any way to give them aid and comfort. A sound discretion is invested in him, and it being of a governmental character, it is not liable to our revision or reversal. Ample authority is also conferred to establish regulations and appoint agents to carry them out. The circumstances of the country and of the particular locality drawn into this controversy, we have seen, fully justified the exercise of the jurisdiction invested in him. We discover no error, therefore, in the charge and answers to the points of the court below in relation to this part of the case.

The remaining question arises upon the demand of the goods made by the teamsters of the plaintiff below. They came under the order of the plaintiff in the early part of June to receive the goods then in the warehouse of the defendants. As to the goods arriving subsequently, which fell into the hands of the insurgents, it is conceded there is no liability, if the regulations of the secretary were lawfully extended to Franklin county. It is contended that it was the duty of the defendants, if they relied on their lien for the freight, to specify the amount, and to demand that sum and no more. We think the question was submitted to the jury under proper instructions. The jury was told by the judge in his general charge that the defendants were responsible, if at the time of the demand for the goods there was no demand made by them for the freight and charges on the goods—that if made it must have been confined to the freight and charges due on the particular goods demanded, and that the defendants had no right to detain them for previous freight. He also instructed them fairly that the right to detain and to demand a permit and affidavit for license to transport the goods did not exist if the goods were intended for the plaintiff's furnace north of the Gettysburg parallel. In reference to the specific demand of the freight, he said it was the duty of the plaintiff, when the freight was demanded, to offer to pay the freight, and then, if the defendants did not specify the amount claimed to enable the plaintiff to pay the same, they would not be justified in refusing to deliver the goods. Now, clearly these instructions were entirely adequate to the evidence in the case and founded upon it. The wagoners neither asked for the amount of freight, nor offered to pay it; had no money to pay it, and simply in reply to the demand of the freight, said they would tell the plaintiff. The case was submitted to the jury on its facts. We discover no error that requires a reversal, and we therefore affirm the judgment.